**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HARVEY KALAN, M.D.; THE HARVEY KALAN, M.D., INC. EMPLOYEE WELFARE BENEFIT PLAN; PAMELA K. ERDMAN, M.D.; THE DR. PAMELA K. ERDMAN, M.D., INC. EMPLOYEE WELFARE BENEFIT PLAN; DRS. MARTIN & ELISSA ZENNI; and THE M&E ZENNI INC., WELFARE BENEFIT PLAN, individually and on behalf of all others similarly situated, | **C.A. No.: 2:15-CV-01435-WB**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED AS TO ALL NON-ERISA CLAIMS** |
| Plaintiffs | |
| vs. | |
| FARMERS & MERCHANTS TRUST COMPANY OF CHAMBERSBURG AS SUCCESSOR BY MERGER TO COMMUNITY TRUST COMPANY; LAWRENCE KORESKO; KORESKO FINANCIAL, LLP; FREEDOM BROKERS, LLC; PENNMONT BENEFITS, INC.; AND JOHN DOE COMPANIES 1-50. | |
| Defendants | |

**PROPOSED SECOND AMENDED COMPLAINT**

Plaintiffs Harvey Kalan, M.D., the Harvey Kalan, M.D., Inc. Employee Welfare Benefit Plan, Pamela K. Erdman, M.D., the Dr. Pamela K. Erdman, M.D., Inc. Employee Welfare Benefit Plan, Drs. Martin & Elisa Zenni, and the M&E Zenni, Inc. Welfare Benefit Plan, hereby bring this Second Amended Complaint on their own behalf and on behalf of a class of similarly situated employee benefit plans and their participants and beneficiaries against defendants Farmers & Merchants Trust Company of Chambersburg as successor by merger to Community

Trust Company; Lawrence Koresko; Koresko Financial LLP; Freedom Brokers, LLC; PennMont

Benefits, Inc.; and John Doe Companies 1-50.

## Preliminary Statement

1.      Between 2002 and the end of 2013, John Koresko and affiliated individuals and

entities ("Koresko *et al.*), in the course of operating a multiple employer welfare benefit

arrangement known commercially as the REAL VEBA ("the Arrangement" or "the Koresko

Arrangement"), systematically converted and misused the assets of two trusts, the REAL VEBA

Trust and the Single Employer Welfare Benefit Plan Trust ("the SEWBPT") (collectively "the

Trusts"). The Trusts were created to hold assets for the exclusive benefit of the participants and

beneficiaries of the Arrangement, i.e. employees of participating employers and their designated

beneficiaries.

2.      Much of the defalcation consisted of using the Trusts' assets to pay for services

rendered for Mr. Koresko's personal benefit, for the benefit of companies he owned and

controlled, and for the benefit of certain participating employers who had claimed tax deductions

related to the Arrangement.   These expenditures are set forth in detail in the Memorandum

Opinion issued in *Perez v. Koresko et al.*, 2:09-cv- 00988-WB, E.D. PA. Docket No. 1134 and

its Appendix, Docket No. 1134-1, which is incorporated herein by reference ("the Memorandum

Opinion") and attached hereto as Exhibit A.   In addition, Koresko *et al.* converted over $35

million of the Trusts' assets through unauthorized and improper loans that stripped the Trusts of

cash value that had accumulated in life insurance policies.   The policies were owned by the

Trusts for the benefit of the individual employee benefit plans established by each participating

employer. As the Memorandum Opinion explains, these expenditures and loans were in breach

of numerous provisions of the Employee Retirement Income Security Act of 1974 as amended

("ERISA") and breached fiduciary duties owed by Mr. Koresko and others pursuant to ERISA and common law.

3.     The defendants in the instant case were fiduciaries or companies owned and controlled by them, or individuals who controlled them, and who: (i) participated in and benefited from the conversions; (ii) failed to take appropriate steps to prevent the conversions; (iii) affirmatively enabled the conversions; or (iv) received improper payments in the form of commissions from the insurance companies whose policies the Trusts purchased. This lawsuit, brought under ERISA and under state law, seeks: (i) disgorgement of all moneys paid by the Trusts to the defendants, (ii) disgorgement of all profits made as a result of improper or prohibited transactions, (iii) make-whole remedies, (iv) disgorgement of insurance commissions paid in violation of ERISA and common law, and (v) such other relief as the Court deems appropriate. Plaintiffs also assert claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*, and seek all remedies available under the statute, including treble damages and attorney fees.


**PARTIES**

4.     Plaintiffs are:

     a.     Harvey Kalan, M.D. ("Dr. Kalan"), a citizen of California and a participant in and fiduciary of the Harvey Kalan, M.D., Inc. Employee Welfare Benefit Plan;

     b.     The Harvey Kalan, M.D., Inc. Employee Welfare Benefit Plan (the "Kalan WBP"), an employee benefit plan within the meaning of ERISA. The Kalan WBP was established to provide employee benefits through the Koresko Arrangement;

3

c.      Pamela K. Erdman, M.D. ("Dr. Erdman"), a citizen of Georgia and a participant in and fiduciary of the Dr. Pamela K. Erdman, M.D., Inc. Employee Welfare Benefit Plan;

d.      The Dr. Pamela K. Erdman, M.D., Inc. Employee Welfare Benefit Plan (the "Erdman WBP"), an employee benefit plan within the meaning of ERISA.  The Erdman WBP was established to provide employee benefits through the Koresko Arrangement;

e.      Drs. Martin & Elisa Zenni ("the Zennis"), citizens of Florida and fiduciaries, participants and beneficiaries of the M&E Zenni Welfare Benefit Plan (the "Zenni WBP").  Drs. Martin & Elisa Zenni are both owner/employees of M&E Zenni Inc., the sponsoring employer of the Zenni WBP; and

f.      The M&E Zenni Welfare Benefit Plan ("the Zenni WBP"), an employee benefit plan in which only the owner-employees or their spouses participate.  The Zenni WBP was established to provide benefits through the Koresko Arrangement.

5.      The Kalan WBP, Erdman WBP, Harvey Kalan, M.D., and Pamela K. Erdman, M.D. will be referred to collectively as the "ERISA Plaintiffs."

6.      The Zenni WBP and Drs. Martin & Elisa Zenni will be referred to collectively as the "Non-ERISA Plaintiffs."

7.      Defendants are:

a.      Farmers & Merchants Trust Company of Chambersburg as successor by merger to Community Trust Company ("CTC"), a trustee of the Trusts and a fiduciary under common law and pursuant to ERISA;

b.      Lawrence Koresko, a fiduciary under common law and pursuant to ERISA, a principal of many of the entities that functioned as fiduciaries within the Arrangement,

and a recipient of commissions paid on the insurance policies purchased as part of the Arrangement;

     c.    Koresko Financial LP ("Koresko Financial"), a Pennsylvania limited partnership with its principal place of business in Bridgeport, Pennsylvania. Koresko Financial was a vehicle through which John and Lawrence Koresko were paid commissions by the insurance companies that participated in the Arrangement. Upon information and belief, it was also utilized to hide converted assets;

     d.    Freedom Brokers, LLC ("Freedom Brokers"), a Pennsylvania limited liability company with its principal place of business in Bridgeport, Pennsylvania. Upon information and belief, Freedom Brokers was another vehicle through which John and Lawrence Koresko were paid commissions by the insurance companies that participated in the Arrangement. It was also utilized to hide converted assets;

     e.    PennMont Benefits, Inc. ("PMB"), a Delaware corporation with its principal place of business at the same address as Koresko Financial. PMB is the general partner of Koresko Financial and its officers are John and Lawrence Koresko; and

     f.    Defendants DOES 1 through 50, inclusive, whose names and capacities are presently unknown to plaintiffs, and who are being sued under fictitious names until their identities are learned, at which time leave to amend will be requested. Upon information and belief, the defendant DOES include other individuals and/or business entities owned or controlled by Koresko *et al.* who possess or received funds generated through the Koresko Arrangement, and/or entities which Koresko *et al.* owned or controlled and which were utilized to disguise their activities and to secrete converted assets. The names and capacities are presently

unknown to plaintiffs, and they are being sued under fictitious names until their identities are learned.

8.       Defendants CTC and Lawrence Koresko were, at relevant times, fiduciaries of the plaintiff employee benefit plans. CTC was a fiduciary by virtue of its status as Trustee of the Trusts which held the assets of the plaintiff welfare benefit plans for the benefit of the plans, their participants and beneficiaries.  Lawrence Koresko was a fiduciary by virtue of his role as a principal and controlling person of PMB, the administrator of the Arrangement.

9.       Defendants Lawrence Koresko, Koresko Financial LLP, Freedom Brokers, LLC, PMB and Does 1-50 were recipients of commissions paid by various insurance companies that sold policies to the Trusts.  They will be referred to collectively as the "Commission Recipient Defendants."

10.       All defendants were recipients of plan assets.

11.       An association-in-fact (the "Association-in-Fact") that qualified as an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4) existed but is not named as a defendant. The following entities and individuals, were members of the Association-in-Fact:

   a.   Defendants CTC, Lawrence Koresko, Koresko Financial, LLP; Freedom Brokers, LLC; PennMont Benefits, Inc. and John Doe Companies 1-50;

   b.   John Koresko, V;

   c.   Jeanne Bonney;

   d.   Larry Townsend;

   e.   The REAL VEBA Trust;

   f.   The SEWBPT;

   g.   PMB

6

     h.   The Koresko Law Firms;

     i.   The Regional Employers Assurance Leagues;

     j.   Numerous employer-created employee welfare benefit plans;

     k.   Penn Public Trust ("PPT");

     l.   Numerous insurance salesmen and financial advisors who sold participations in the Arrangement; and

     m.   Numerous insurance companies who supplied life insurance on the lives of the beneficiaries of the participating welfare benefit plans as part of the Arrangement.

12.    The REAL VEBA and SEWBP Trusts also constituted enterprises within the meaning of RICO, 18 U.S.C. § 1961(4) but are not named as defendants.

13.    Defendants were engaged in a conspiracy to convert employee benefit plan assets and each of them is liable for the actions of the other as if he or she, himself or herself, committed them.  Defendants also conspired to and did fraudulently conceal the conversions from the Plaintiffs and the Plaintiff Class through misrepresentations and concealments, and each of them is responsible and liable for the misrepresentations and concealments of the other for purposes of liability and the statute of limitations. All Defendants were acting as the agents of the other with either express or implied authority to so act in furtherance of their common goal to convert assets of the plaintiff employee benefit plans and subsequently fraudulently conceal the conversions, and all Defendants benefitted financially therefrom and ratified the acts of the others.  All Defendants are jointly and severally responsible for the actions of every other Defendant committed in furtherance of the conspiracy.

## JURISDICTION AND VENUE

14.      As most, if not all, of the benefit plans whose assets were held by the Trusts were employee benefit plans within the meaning of ERISA, and as Koresko *et al.*'s conversion of the Trusts' assets and the payments to the Recipient Defendants violated numerous provisions of ERISA, this action seeks appropriate relief for violations of §§ 404, 405 and 406 of ERISA (29 U.S.C. §§ 1104-1106) pursuant to § 409 and §§ 502(a)(2) and (a)(3) of ERISA (29 U.S.C. §§ 1109, 1132(a)(2) and 1132(a)(3)). This Court has original jurisdiction pursuant to §502(e)(1) of ERISA (29 U.S.C. § 1132(e)(1)).

15.      The Court also has original jurisdiction over the RICO claims pursuant to 18 U.S.C. § 1964(c).

16.      The Court has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a).

17.      Venue is appropriate in the Eastern District of Pennsylvania, as the employee benefit plan plaintiffs were administered in the district, the defendants conduct business in the district, and a substantial part of the acts and omissions giving rise to the claims and causes of action took place in the district.

## Class Allegations

18.      Plaintiffs seek to pursue this action on their own behalf and on behalf of a class (the "Class") of all participants in, and beneficiaries of, benefit plans whose assets are held by the REAL VEBA Trust or the SEWBPT, and on behalf of all benefit plans whose assets are held by the REAL VEBA Trust or the SEWBPT.  In addition, Plaintiffs seek to represent two sub-classes (the "Sub-classes"): (1) a sub-class of all benefit plans governed by ERISA, as well as said plans' participants and beneficiaries; and (2) a sub-class of all benefit plans not governed

by ERISA, as well as said plans' participants and beneficiaries. Counsel for Plaintiffs are excluded from the Class and the Sub-classes. The class members of the Class and both Sub-classes are readily ascertainable from the records of Koresko *et al.* and from records currently under the control of the court-appointed independent fiduciary and the court-appointed administrator assisting the Court's liquidation of the Trusts in *Perez*.

19.     The assets of over 200 employee benefit plans are held by the Trusts.  These plans, in aggregate, have over 500 participants and beneficiaries, making joinder of all class members impracticable.

20.     There are questions of law and of fact common to the Class.

21.     The common questions of fact include, but are not limited to:

a.      The amount of commissions paid to the Commission Recipient Defendants;

b.      The nature of the defendants' knowledge of and participation in the conversion of benefit plan assets;

c.      The terms and scope of CTC's relationship to the Trusts;

d.      The circumstances surrounding CTC's delegation of signatory and other powers to Koresko *et al.*;

e.      The steps taken by CTC to monitor and supervise the financial transactions engaged in by Koresko *et al.*;

f.      Whether defendants embezzled employee benefit plan assets;

g.      The damages sustained as a result of Koresko *et al.'s* and CTC's misconduct during the time CTC was the Trusts' trustee;

h.      Whether CTC mispresented its authority as Trustee of the Trusts;

i.      Whether the Association-in-Fact or the Trusts constituted an "enterprise" under RICO;

j.      Whether CTC, Lawrence Koresko, or the entities Lawrence Koresko owned or controlled, "conducted" or "participated in the conduct" of the enterprise's affairs through a "pattern of racketeering activity"; and

k.      Whether the defendants conspired to violate 18 U.S.C. § 1962(c).

22.     The common questions of law include, but are not limited to:

a.      Whether CTC and Lawrence Koresko were fiduciaries under ERISA and applicable common law;

b.      Whether CTC and Lawrence Koresko breached their duties as fiduciaries under ERISA and applicable common law

c.      Whether CTC and Lawrence Koresko were required to take steps to prevent Koresko *et al.*'s misconduct;

d.      The remedies that should be imposed on CTC and Lawrence Koresko;

e.      Whether the Commission Recipient Defendants violated § 406 of ERISA and state law by accepting the commissions;

f.      Whether the Association-in-Fact or the Trusts constituted an "enterprise" engaged in interstate commerce;

g.      Whether defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, or conspired to do so.

23.     The claims of the representative parties are typical of the claims of the Class.

24.     The representative parties will fairly and adequately represent the interests of the

Class.

25.     Prosecuting separate actions by or against individual class members would:

a.   Create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class; and

b.   Create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

26.     The questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## OPERATIVE ALLEGATIONS

### Origins of the Koresko Arrangement

27.     Koresko *et al*. are a group of interrelated entities together with their principals and certain employees.  The entities were all created and established by John and Lawrence Koresko as entrepreneurial vehicles designed to take advantage of section 419(A)(f)(6) of the Internal Revenue Code ("IRC" or "Code).

28.     Prior to the 1984 passage of §§ 419 and 419A of the IRC, expenditures for employee benefits were deductible under IRC § 162.  *See Greensboro Pathology Associates, P.A. v. U.S.*, 698 F.2d 1196 (Fed. Cir. 1982).  Sections 419 and 419A placed substantial limitations on the deductibility of these expenses; however, Congress saw fit to carve out an

exception for "10 or more employer plans."  For "10 or more employer plans," the newly adopted limitations did not apply.  IRC § 419A(f)(6).

29.     Though the language of § 419A(f)(6) is deceptively simple, the scope and applicability of § 419A(f)(6) has long been a subject of dispute.  The Code itself states only that more than one employer must contribute to the plan, no employer may normally contribute more than 10% of the total, and the plan may not maintain "experience-rating arrangements with respect to individual employers."  IRC § 419A(f)(6).

30.     In 1995, the Service issued Notice 95-34 to "alert taxpayers and their representatives to some of the significant tax problems that may be raised by [trust] arrangements [which claim to satisfy § 419A(f)(6)]."  The notice advised that such arrangements might not satisfy § 419A(f)(6) if they are actually providing deferred compensation, if they are, in fact, separate plans maintained for each employer, or if they are experience-rated.

31.     The issues raised by Notice 95-34 were parsed in *Booth v. C.I.R.*, 108 T.C. 524 (U.S. Tax Ct. 1997).  The Tax Court, while disagreeing with the Commissioner's view that the plan in *Booth* was one of deferred compensation, found the plan did not satisfy § 419A(f)(6) because it maintained separate accounts for each employer and the employees could only look to their employer's account to pay benefits.  Hence, the court reasoned, the plan was actually an amalgamation of separate plans.  Moreover, the court found that the arrangements had the effect of adjusting benefits based on prior experience and, therefore, the plan was an experience rating arrangement.  Consequently, the *Booth* plan did not satisfy § 419A(f)(6).

32.     After the *Booth* decision, Koresko and other entrepreneurs sought to take

advantage of § 419(A)(f)(6) by marketing "plans" that claimed to come under the section's exception to the limitations on the deductibility of welfare benefit expenditures (hereinafter "419A(f)(6) plans").

**The Arrangement Itself**

33.     The Koresko Arrangement claimed to offer a vehicle through which owner/employees could purchase cash value life insurance and deduct the premiums as business expenses.

34.     Though the documents Koresko drafted to implement the Arrangement were complex to the point of unintelligibility and contained numerous internal contradictions that made key provisions meaningless, the basic structure relevant here was relatively straightforward and is best described in the words of one of Koresko's marketing pamphlets.

35.     In providing an example of how the Arrangement worked, the pamphlet posited a "Mr. X," who owned a business and a "Joe Honest," Mr. X's insurance agent/financial advisor. Joe introduced Mr. X to PMB, the company utilized to nominally run the Arrangement, and, after Mr. X decided to enter the Arrangement:

> [Mr. X] asked Joe to obtain a cash value policy for himself and term insurance for the other participants. Mr. X informed Joe that he desired to shelter $100,000 in the VEBA before year end. Mr. X asked Joe to determine if that was permissible.
>
> Joe submitted a Proposal Request form to **Penn-Mont Benefit Services. Penn-Mont** produced a proposal which illustrated potential tax savings, a death benefit for employee (A) for $450,000; (B) for $250,000; and (C) for $300,000, and a $1.5 million death benefit for Mr. X, the owner/employee; and a cash value build-up which would be used to pay severance benefits or distributed to the participants upon plan termination.
>
> Pleased with the result, Mr. X forwarded a check in the amount of $100,000 payable to Commerce Bank, N.A., the trustee [before December 31]. After clearance of the check, the corporation,

13

trustee, and employees completed the life insurance applications on behalf of Mr. X and employees A, B and C. After approval, the trustee paid the premiums.

36.     To take advantage of this superficially attractive proposition, a prospective participating employer was required to sign an Adoption Agreement which:

>   a.   Established the employer's own welfare benefit plan;
>
>   b.   Adopted a Koresko-prepared prototype as the terms of the benefit plan; and
>
>   c.   Agreed to the terms of a pre-existing trust (either the REAL VEBA Trust or the SEWBPT) created by Koresko.

37. The trustee then functioned as a pass-through vehicle, receiving the insurance premiums paid by the employer and then paying them to the insurance companies.

38.  The trustee was also named as the owner and beneficiary of the policies f/b/o the employer's individual welfare benefit plan.  When benefits were to be paid, typically upon the death of a participant, the insurance company would pay the death benefit to the trustee who, in turn, was supposed to pay the benefit to the participant's designated beneficiary.

39. Alternatively, an employer could terminate the plan and the accumulated cash value of the insurance policies would be distributed to the plan participants pursuant to a formula that resulted in the owner/employees receiving all or virtually all the cash value.

**The Breaches of Fiduciary Duties**

40. As alleged and established in *Perez*, between 2002 and at least September 2008, CTC converted assets of the Class benefit plans ("the WBPs") on 158 separate occasions by transferring the assets to Koresko controlled entities or to entities performing services for Koresko that did not benefit the plans. *See Perez*, Doc. 1134-1 at 3-8 (an Appendix to the Memorandum Opinion) attached as Exhibit A.

41. In addition to the conversions described in the paragraph above, Koresko *et al.* committed numerous additional acts of conversion during CTC's tenure as trustee, which ended in January of 2010. CTC not only failed to take any steps to prevent these conversions but, as will be described below, affirmatively aided and abetted them.

42. Most of the conversions and numerous other fiduciary breaches are detailed in the *Perez* Memorandum Opinion, incorporated herein by reference. At least $40 million was converted, and the total likely approached $75 million. Exhibit A, which identifies over $39 million in unlawful transfers, does not appear to include the 2009 loan conversions described in paragraph 2, above. An additional $35 million was converted through these illegal loans, of which at least $34 million was embezzled between July and September 2009, while CTC was serving as trustee.

43. The misconduct was not limited to conversions. Though not discussed in the Memorandum Opinion, Koresko, both directly and through the Commission Recipient Defendants, received millions of dollars in commissions from the insurance companies that sold policies to the various WBPs. The payment and receipt of these commissions was in violation of § 406 of ERISA, 29 U.S.C. § 1106.

**CTC's Role in the Conversion Scheme**

44. From April 2002 through January of 2010, CTC was custodial trustee of the WBPs' assets, trustee of the Trusts which (i) held the employer contributions to the WBPs before they were paid out to the insurance companies as premium, and (ii) were listed as owners of the WBPs' insurance policies after CTC and Koresko *et al.* improperly changed the nominal owner of the policies. Thus, during the time most of the conversions took place, it was a fiduciary of the

Trusts, the WBPs, the WBPs' participants, and the WBPs' beneficiaries, and it had a fiduciary duty to Plaintiffs and the Class to monitor and safeguard the WBPs' and the Trusts' assets.

45. CTC became trustee on April 15, 2002. It replaced Wachovia National Bank, f/k/a First Union National Bank.

46. Upon information and belief, Koresko *et al.* needed a new trustee because First Union refused to agree to give Koresko and his affiliates *carte blanche* with respect to the Trusts' and the WBPs' assets and refused to execute documents that would give the impression the trust agreements permitted Koresko to (i) change the owners and beneficiaries of the insurance policies, (ii) surrender the polices, or (iii) borrow money using the policies' cash value as collateral.

47.    CTC had no such compunctions and the first, i.e., earliest, conversion identified in the Memorandum Opinion, the transfer of $414,517.88 "From Trustee Transfer to PPT," (Exhibit A at 7, row 210), took place on April 16, 2002, just one day after CTC succeeded First Union as trustee. PPT was and is an entity owned and controlled by Koresko. In 2002, it had no *de jure* connection to the plans or the Trusts.

48. The connection between CTC becoming trustee and the commencement of the conversions is further evidenced by a series of agreements between CTC and Koresko *et al.* entered shortly before CTC became trustee. These agreements were nothing less than agreements to convert WBP and Trust assets.

49. One set of agreements assured CTC's participation in the conversion of interest earned on WBP assets. On or about March 22, 2002, one month before CTC became trustee, CTC committed to give Koresko *et al.* control over all interest earned on employer contributions. Since the contributions were deposited into interest earning accounts and remained there for

months before the funds were paid to the insurance companies as premium, the interest earned on this "float" was substantial. Upon information and belief, in many instances, Koresko *et al.* instructed CTC to delay paying the premiums so that additional interest could be earned.

50.  This interest belonged, not to Koresko *et al.,* but to the WBPs or the Trusts. Despite that, CTC agreed to delay payment of premiums and to disperse all earned interest per Koresko *et al.*'s instructions. Of course, the instructions were to transfer the interest to Koresko owned and controlled accounts.

51. The illicit nature of the agreement was made explicit shortly after CTC became trustee. On June 5, 2002, CTC and Koresko *et al.* modified the earlier agreement by agreeing that "Interest earned at the end of each month will be wired to Penn Public Trust."  As stated earlier, PPT was owned and controlled by Koresko and had no *de jure* connection to the Trusts or the WBPs at that time. CTC was aware of this fact.

52. A second set of agreements set the stage for conversion of WBP assets once the premiums had been paid to the insurance companies, thus transforming the employer contributions into insurance policy cash value. On or about March 20, 2002, still almost a month before it became trustee, CTC agreed to and did execute a series of documents that were then provided to the various insurance companies who had sold policies through the Koresko Arrangement. The documents, titled "Verification of Trust and Warrant of Authority" (the "Verifications"), were signed by CTC in its purported capacity as trustee of the REAL VEBA Trust and designated Jeanne Bonney, Koresko's associate, as "Appointed Signator" with authority to sign Arrangement-related documents on behalf of CTC.  Lawrence Koresko and Jeanne Bonney signed the Verification for Koresko *et al.* The "Verifications" also certified that:

> The trust empowers the trustee to exercise any and all rights associated
> with owning life insurance policies and the trustee can exercise these

rights without the consent of the insured. These rights include but are not limited to: surrendering the policy, withdrawing policy values, borrowing against the policy, transferring ownership, and changing the beneficiary.

53. In fact, the trust documents, which CTC had in its possession when it executed the Verifications, and the terms of which CTC knew well, did not give the trustee any such powers. Thus, the Verifications were knowingly false and they effectively gave Jeanne Bonney – and, through her, Koresko, who controlled Bonney's actions – the keys to the kingdom, opening the door to the subsequent conversion of between $40 million and $75 million in plan assets.

54. CTC began transferring plan assets to Koresko *et al.* immediately upon becoming trustee. As shown in Exhibit A, in 2002 alone, CTC conveyed $817,821.13 in plan assets to Koresko *et al.* through 26 separate transfers. In a series of knowingly prohibited and criminal transactions, $726,962.82 of the embezzled funds were transferred by CTC directly to three entities owned and controlled by John and Lawrence Koresko, PPT, PennMont Benefit Services, and Koresko's law firm. *Perez*, Doc. 1134-1, rows 102-109, 110, 136, 160-166, and 210-218. Lawrence Koresko was fully aware of these illegal asset transfers.

55. Over the next seven years, CTC conveyed an additional $4,641,246.17 in plan assets to Koresko *et al.* through an additional 132 separate, knowingly illegal transfers. $4,193,884.40 of these embezzled funds were transferred directly to PPT, PMB, or Koresko's law firm. The precise date and amount of each transfer is set forth in Exhibit A. Lawrence Koresko was fully aware of these illegal asset transfers.

56. These illegal asset transfers were contrary to the provisions of the documents governing the Arrangement including the REAL VEBA and SEWBP Master Trust documents, pursuant to which CTC served as Trustee, and the Master Plan document. The Master Trust documents state at Section 2.1 that "all assets and earnings of the Trust are solely the net

earnings of the Trust and shall not in any manner whatsoever inure to the benefit of any other person other than a Person designated as an employee or beneficiary of an Adopting Employer under the terms of the Plan." Similarly, Section 4:02 of the Master Plan document provides that "[a]ny and all other contributions to this Plan by the Employer shall be irrevocable and neither such contribution nor any income therefrom, nor any increments thereon shall be used for or diverted to purposes other than for the exclusive Benefit of participating Beneficiaries of the adopting Employer." The Master Plan further states at Section 2:03 that there shall be no diversion of plan assets.

57. Koresko *et al.* made prompt use of the signatory authority CTC had given Jeanne Bonney in the illegal Verifications. In or about September 2002, Bonney, on behalf of CTC and Koresko & Associates, and as counsel for John and Lawrence Koresko's PMB, wrote or emailed insurance companies that had issued policies through the Arrangement and, based on the purported authority of the Verifications, instructed them to "change the name of the owner/beneficiary from [employer] WBP to REAL VEBA TRUST DATED 3/20/95." (Brackets in original). Approximately 1200 insurance policies issued by some 46 separate carriers were converted from the WBPs to the REAL VEBA Trust in this fashion, further setting the stage for conversions, concealment of fiduciary breaches, and the illegal 2009 loans.

58. By way of example, on September 20, 2002, Bonney utilized the bogus authority given to her by CTC to email CNA Insurance Company and instruct it to surrender policies owned f/b/o one of the employer's WBP. The request was complied with.

59. CTC was copied on all the communications between Bonney and the insurance companies and was fully aware the Verifications had created the illusion Koresko *et al.* possessed authority beyond that which it knew to be conferred by the trust and plan documents.

60. Yet another agreement entered into by CTC before it became trustee aided, abetted and enabled conversions. This agreement, executed by CTC Chairman, Lowell R. Gates, and John Koresko, with the knowledge of Lawrence Koresko, was titled a "Custodial Agreement." It designated KAPC, Koresko's law firm as CTC's agent and gave KAPC possession of the 1200 insurance policies CTC was to own as trustee f/b/o the employer WBPs, including those in the Plaintiff Class; in other words, virtually all of the plans' assets.

61. The Custodial Agreement:

a.   Purported to release KAPC from any liability other than liability arising from "willful or gross negligence," (sic), a standard directly at odds with that mandated by ERISA; and

b.   Granted KAPC the same bogus powers given to Jeanne Bonney, i.e., the authority to change ownership and beneficiaries of the insurance policies, surrender policies, and remove cash value through withdrawals or policy loans.

62. After it formally became trustee on April 15, 2002, CTC ratified all these agreements and permitted Koresko *et al.* to use the burglar's tools it had given them in unfettered fashion. At all relevant times, CTC had actual or constructive knowledge that Koresko *et al.* were engaged in self-dealing, embezzling plan assets and using plan assets for improper purposes in violation of ERISA §§ 404, 406, and other statutory provisions. Yet, instead of taking reasonable steps to monitor Koresko *et al.* and prevent or remedy the breaches, CTC participated in them by transferring plan assets to Koresko controlled entities, and by failing to void the documents which Koresko *et al.* were using to effectuate the conversion of plan assets. Without engaging in any effort to determine the reasonableness, necessity or legitimacy of the requests for transfers of

plan assets, CTC recklessly consented to all requests for funds made by Koresko *et al*. and allowed Koresko *et al*. to misrepresent themselves as CTC in dealings with third-parties, thus carrying out and enabling further conversions.

63. The series of agreements between CTC and Koresko *et al*. effectively turned CTC into a sham trustee whose function was (i) to mislead prospective and existing plan participants, sponsors and beneficiaries into believing there was an independent trustee acting as a check on Koresko's access to plan assets, and (ii) to mislead insurers into acceding to Koresko's illegal loan demands.

64. In exchange for providing this vehicle for embezzlement, CTC was paid hundreds of thousands of dollars and the law firm of its Chairman, Lowell Gates, was paid legal fees.

65. CTC breached its fiduciary duties in numerous and egregious ways. *Inter alia,* it:

    a.  Breached its duty of undivided loyalty;

    b.  Failed to act in the sole interests of the Arrangement's participants and beneficiaries;

    c.  Failed to act for the exclusive purpose of providing benefits to participants and beneficiaries;

    d.  Failed to act with the care, skill, prudence and diligence that a prudent man acting in its position would use;

    e.  Failed to act in accordance with the documents and instruments governing the Arrangement; and

    f.  During the time the WBPs' and the Trust's assets were being converted, failed to reasonably or adequately oversee and monitor the plan administrators, i.e., Koresko, *et al*. CTC conducted no oversight of the cash value of the insurance

policies, participated in no meetings or conferences with Koresko *et al.* regarding the status and security of the WBPs' and the Trusts' assets, and did not communicate with the insurance companies regarding the status and security of these assets.

66. The Memorandum Opinion (¶¶ 53-56) describes one aspect of CTC's complicity as follows:

> 53. To transfer money out of the Trusts, PennMont would send emails to CTC or F&M Trust employees, directing CTC or F&M Trust as trustee to transfer funds from the Trusts to various other accounts. June 9, 2014, Tr. 62:1863: 4 (Sweeting); see, e.g., GX58, 60, 62, 63, 65, and GX2a1 to 2a2, 2a5, 2a7, 2a8, 2a13, 2a14, 2a15.

> 54. Jeanne Bonney typically sent these emails to CTC and F&M Trust on behalf of PennMont, using either a PennMont email account or some sort of Koresko law firm email account. See, e.g., GX2a19; GX2a21. The two email accounts were "interchangeable." GX176 at 55:3 (Bonney Dep., July 30, 2014).

> 55. Prior to the merger with F&M Trust, CTC did not require PennMont to submit any invoices, bills, or other documentation supporting its requests to transfer money from the Trusts. GX152 at 37:14-37: 20 (Bonney Dep., Aug. 9, 2009). Upon becoming trustee, F&M Trust required PennMont to submit additional documentation along with its transfer requests. Id. at 37:1438: 7 (Bonney Dep., Aug. 9, 2009)

.

> 56. Previously, CTC's oversight consisted of "random policy check[s]" and random invoice checks "every six months." GX176 at 68:968:10 (Bonney Dep., July 30, 2014).

67. Not only did CTC actively participate in and facilitate conversions; it also fraudulently concealed the conversions and other material facts the WBPs' participants, beneficiaries, and fiduciaries other than those controlled by Koresko needed to know to protect themselves and the WBPs from the defalcations. As a fiduciary, CTC had an obligation to inform these fiduciaries, participants, and beneficiaries of (i) the existence of its various agreements

with Koresko *et al.*, (ii) the dangers associated with the agreements, (iii) the agreements' variance from the terms of the plan documents and (iii) the transfers and conversions of plan assets. It did not do so. In fact, CTC took affirmative steps to conceal critical information, including information that would have revealed the misconduct, from participants and beneficiaries – i.e., the Plaintiff Class -- by, among other things: (1) agreeing from the time it assumed the position as trustee not to communicate with plan participants and beneficiaries regarding matters pertaining to the Arrangement, (2) agreeing to refuse any and all requests for pertinent substantive information from the Class, and (3) abiding by these agreement by affirmatively refusing to speak to Class members throughout its involvement with the Arrangement, even on such topics as the administration of the WBPs and the safety of WBP assets, and even when contacted about such topics by participants.

68. CTC also allowed Koresko to continue to market his Arrangement with misrepresentations that the Arrangement included an independent trustee and complied with the terms of the plan documents, when it knew otherwise; in this way, CTC and Koresko *et al.* actively enabled further fraudulent sales of participations in the Arrangement, and fraudulently concealed the misconduct from prior, previously-defrauded participants.

69. CTC's willingness to be held out as an independent trustee - when it knew that it had abrogated any meaningful role in safeguarding plan assets – caused plaintiffs and the Class to relax its vigilance on the assumption that a legitimate trust company was owner of all WBP assets f/b/o the WBPs.

70. As further part of the fraudulent concealment, at some time between 2005 and 2007, CTC, through the agents it had given apparent authority via the Custodial Agreement and the

Verifications, instructed the insurers that had sold policies through the Arrangement not to disclose any information to the WBPs, the WBP sponsors, participants, or beneficiaries.

The insurers complied with these instructions and, consequently, plaintiffs and the Class were unaware of the illegal loans described above.

71. As a common policy, practice, and scheme perpetrated by Koresko *et al.* from the outset of the Arrangement and at least through the time of the filing by Koresko-related entities for bankruptcy protection in 2013, Koresko *et al.* routinely provided participants and beneficiaries false reassurances that the Arrangement was functioning properly and nothing was amiss with it, including when participants and beneficiaries contacted them regarding the status of their WBP. The false reassurances – part of the conspiracy among the defendants here -- usually were made by Larry Townsend, a KAPC employee and PMB agent, Jeanne Bonney, or Larry Koresko, and/or financial advisors and insurance agents interacting with participants and beneficiaries at Koresko *et al.*'s behest.

72. Consequently, plaintiffs and the Class could not have discovered the wrongdoing or their injuries regardless of their level of diligence, as all sources of sufficient information, including that necessary to satisfy the pleading standards of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), were cut off.

73. As a result of this fraudulent concealment:

    a. Plaintiffs and Class members did not learn of the loans (and other conversions of plan assets) until sometime after September 2013, when the Court removed Koresko and appointed an independent fiduciary ("the IF").  Class members only learned if the policies on their lives had been impacted by the loans (not all policies were impacted and, in some instances, the loans were repaid fully

or partially prior to the appointment of the IF) when the IF sent the WBP sponsors copies of the annual statements the IF received from the insurers. These statements, which CTC had withheld from everyone but Koresko *et al.*, revealed any outstanding loans secured by the policies' cash value. As the IF did not receive or distribute annual statements until sometime in 2014, after it had received the annual statements for the year ending December 31, 2013, Class members were unable to determine the status of the policies on their lives until mid-2014; and

b.  Plaintiffs did not learn of the 158 CTC conversions listed in Exhibit A until the Memorandum Opinion was issued in February of 2015.

74. From as early as 2005 – and most likely well before – CTC was aware that Koresko *et al.* had been receiving substantial commissions for placing the insurance policies in blatant violation of ERISA § 406.

75. CTC was not only a direct participant in the conversions and concealment; it was also notified of the illegality by third-parties, including by, among other things, the Department of Labor's investigation of the Arrangement, *Chao v. Community Trust Company*, E.D. Pa., C.A. No. 05-00018, and Koresko *et al.*'s refusal to cooperate. *Chao v. Koresko et al.* E.D. Pa., C.A. No. 04-00074. CTC learned of this in 2005 at the latest. In response, rather than conduct its own investigation or cooperate with DOL, CTC refused to provide any information to DOL and, instead, took direction from Koresko on how to obstruct DOL's investigation.

76. Despite or, more likely, because of its first-hand knowledge and involvement in the wrongdoing, CTC still failed to conduct any investigation or restrict Koresko *et al.*'s unfettered access to the WBP and Trust assets CTC possessed.

77. Even after being joined as a defendant in *Perez*:

    a.  CTC failed to terminate the Custodial Agreement, and failed to revoke the Verifications - the simplest and most obvious steps to prevent further conversions - until another eight months had passed. It was precisely during this eight-month period that virtually all the $35 million in illegal cash value loans were effectuated in CTC's name; and

    b.  CTC failed to notify the Arrangement's constituent plans, plan participants, and plan beneficiaries of the *Perez* lawsuit, of the allegations swirling around Koresko, and of the wrongdoing it had participated in, enabled, and was still ongoing.

Lawrence Koresko

78. As a principal of various entities utilized to effect the Arrangement, including PMB, PennMont Benefits, PPT, Koresko Financial, and Freedom Brokers, Lawrence Koresko received substantial income from the Trusts' assets in the form of funds improperly transferred to these entities and in the form of commissions from the insurance companies who sold policies through the Arrangement

79. At all relevant times, he was a fiduciary and a party-in-interest but, rather than take steps to prevent the numerous breaches of fiduciary duties, Lawrence Koresko knowingly participated in, facilitated and benefitted from the breaches.  He was aware of the improper compensation, aware of the loans stripping out cash value, aware of the commissions and of all other violations outlined in the Memorandum Opinion and above

80. On behalf of PennMont Benefit Services, he signed the agreements with CTC

described above that enabled the conversion of the insurance policies and the conversion of the policies' cash value.

81. Lawrence Koresko also had direct dealings with many of the class members and affirmatively concealed the violations including the fact that cash value had been stripped out of the class members' policies.

Koresko Financial

82. Koresko Financial was a vehicle utilized by John and Lawrence Koresko to receive commissions in violation of ERISA § 406. As the Koreskos were the principals of Koresko Financial, it was aware of all the violations of ERISA committed by its principals and was aware that the commissions paid to it were in violation of ERISA § 406. Thus, it knowingly participated in and benefitted from these fiduciary breaches.

83. Upon information and belief, Koresko Financial may also have received other funds that were plan assets.

Freedom Brokers

84. Freedom Brokers was a vehicle utilized by John and Lawrence Koresko to receive commissions in violation of ERISA § 406. As the Koreskos were the principals of Freedom Brokers, it was aware of all the violations of ERISA committed by its principals and was aware that the commissions paid to it were in violation of ERISA § 406. Thus, it knowingly participated in and benefitted from these fiduciary breaches.

85. Upon information and belief, Freedom Brokers may also have received other funds that were plan assets.

PennMont Benefits

86. PennMont Benefits was yet another vehicle utilized by John and Lawrence

Koresko to receive commissions in violation of ERISA § 406.  As the Koreskos were the principals of PennMont Benefits, it was aware of all the violations of ERISA committed by its principals and was aware that the commissions paid to it were in violation of ERISA § 406. Thus, it knowingly participated in and benefitted from these fiduciary breaches.

87. Upon information and belief, PennMont Benefits may also have received other funds that were plan assets.

**STATUTE OF LIMITATIONS**

88. Plaintiffs did not discover, and in the exercise of reasonable diligence, could not have discovered, their injury, that their injury was caused by the Defendants, or the basis for their claims alleged herein, any earlier than sometime well after July 23, 2013. On that date Koresko, the Trusts, PMB, Penn Public Trust, Koresko & Associates, P.C., and the Koresko Law Firm, P.C. filed for protection under Chapter 11 of the bankruptcy code (the "Koresko Bankruptcies").

89. Before that time, Plaintiffs did not discover, and had no actual knowledge of, the facts underlying their claims against Defendants here, or Defendants' culpability for the claims alleged here, or of their injury, or Defendants' culpability for their injury. In addition, before that time, Plaintiffs could not discover, and in the exercise of reasonable diligence should not have discovered, the basis for their claims against Defendants here, or of Defendants' culpability on the facts alleged here, or of the injury they suffered from wrongdoing upon which those claims are based, or of Defendants' culpability for that injury.

90. Plaintiffs' claims herein are based upon fraudulent conduct, including, but not limited to: (1) CTC's issuance of the fraudulent Verifications to Koresko *et al.* enabling the misappropriation and embezzlement of Trust assets; and (2) the fraudulent misappropriation and embezzlement of Trust assets.

91. Each of these fraudulent acts were material to the Arrangement and intentionally undertaken by the Defendants in support of their conspiracy and scheme of wrongdoing. Plaintiffs were ignorant of each of these acts, and they relied on them by continuing and maintaining their participation in the Arrangement in ignorance of Defendant's conduct. Insofar as the Defendants' acts were fraudulent, their acts, without more, toll the statute of limitations until Plaintiffs, with the exercise of reasonable diligence, knew of their injuries, and who and what caused them, and the basis of their claims.

92. None of the Plaintiffs knew or should have known of their injuries complained of here, or of who and what caused them, or the basis of their claims, until well after July 23, 2013, when the Koresko Bankruptcies were filed. Each of the Plaintiffs exercised the level of diligence in discovering their claims and injuries, and the cause of their claims and injuries, and Defendants' culpability in that regard, that a reasonable person would employ under the facts and circumstances of the matter and situation at bar. Moreover, regardless of the level of diligence, plaintiffs could not have discovered their injuries until sometime after Koresko was removed in September 2013, including, but not limited, to, because of the fraudulent concealments of Koresko *et al.* and CTC, including that alleged above.

93. For the entire period through at least Koresko's removal in September 2013, Koresko *et al.* and the Defendants fraudulently concealed from Plaintiffs the misappropriation and embezzlement of Trust assets, breaches of fiduciary duties, and their other wrongdoing alleged herein, including, but not limited to, as alleged in paragraphs 44-77, above, and at no time reported any such misconduct to Plaintiffs or reported to anyone that Plaintiffs were being injured as a result of it.

94. Plaintiffs had a right to trust and rely on Defendants, who were Plaintiffs' fiduciaries, to honor their fiduciary duties to them, including their duties of full disclosure of material facts concerning the Arrangement, and Plaintiffs did, in fact, so rely.

95. The independent, affirmative acts of fraudulent concealment by Koresko *et al.* and the Defendants – i.e., "independent" from the acts of misappropriation upon which Plaintiffs' claims are predicated – including the acts alleged in paragraphs 44-77, above, tolled the statute of limitations until well after the filing of the Koresko Bankruptcies. Koresko, from the commencement of the Arrangement, and through and after July 23, 2013, engaged in affirmative acts of fraudulent concealment of his misappropriation and misuse of assets (described above), as well as Plaintiffs' resulting injuries, and the culpability of the Defendants for these injuries. Koresko *et al.* participated in the misappropriation of millions of dollars of assets from 2002 through 2013, and failed to disclose any such misappropriation, or CTC's participation in the misappropriation, up through and even well after the Koresko Bankruptcies were filed.

96. Moreover, through the time of the filing of the Koresko Bankruptcies, and through today, Koresko *et al.* and CTC have repeatedly and aggressively denied engaging in any wrongdoing, including that alleged herein, or causing any injury to Plaintiffs. And, in this litigation, CTC refused to produce any documents until November 2016, approximately one year after Plaintiffs served its first request for production of documents.

97. As fiduciaries of the Plaintiff Class, Koresko, *et al.* had duties to refrain from the above-described defalcations, as well as from hiding them from the Plaintiffs.

98. Koresko's fraud and concealment can be imputed to CTC and Lawrence Koresko to toll the statute of limitations here. *First*, for purposes of the acts giving rise to Plaintiffs' claims here, Koresko was CTC's agent, made so by express agreement of CTC, and

by CTC's conduct, including CTC's authorizing Koresko associate Jeanne Bonney – whose conduct Koresko completely controlled -- to bind CTC, as Trustee of the Trusts, in dealings regarding the assets of the Trusts.

99. *Second*, as alleged above, Koresko, CTC, and Lawrence Koresko formed a conspiracy to misappropriate Trust assets held for the benefit of Plaintiffs in violation of ERISA, RICO, and the common law and to hide the illegal conduct from the Plaintiff Class. John and Larry Koresko began negotiating with CTC to become Trustee of the Trusts in March 2002, and they hired CTC to be Trustee in about April 2002.  At that time, they and CTC agreed that they would work together to effectuate transactions which constituted misappropriations of Trust assets and prohibited transactions under ERISA.

100.    All the indicia of a conspiracy are present:

    a.   John and Lawrence Koresko and CTC had a shared, common purpose – i.e., to misappropriate the plans' assets.

    b.   They had a common plan – e.g., to carry out such transactions and to conceal them by: (1) wire transfer requests made by John or Lawrence Koresko or their agents or affiliated entities and fulfillment of those requests by CTC without any justification or documentation supporting their legality; (2) creating documents which gave third parties, such as insurance companies, the false impression that Koresko *et al.* had the authority to change the owners and beneficiaries of policies held by the Trusts, to surrender policies, and to borrow funds based on the policies' cash value and (3)  permitting Koresko and/or his agent Jeanne Bonney to bind CTC in dealings with insurance

companies, including borrowing based on the cash value of Trust-owned
insurance policies which stripped the Trust of millions of dollars of assets; and

    c.   They had a common interest – namely, to enjoy the financial fruits of this
conspiracy through, for John and Lawrence Koresko, cash payments received
via the wire transactions and the cash value loans, and, for CTC, substantial
fees for serving as Trustee, with potential for additional business from
Koresko *et al.*

101.   John and Lawrence Koresko and CTC all acted in furtherance of the conspiracy,
including as follows:

    d.   John and Lawrence Koresko, individually or through their control of PMB
and/or Jeanne Bonney, directed the illegal wire transfers to be made, including
those detailed in the *Perez* Appendix (Doc. 1134-1), requested the loans from
the insurance companies, and fraudulently concealed such conduct from the
Plaintiffs;

    e.   CTC fulfilled each of these illegal wire transfers, enabled the illegal loans to
be taken, and fraudulently concealed this conduct from the Plaintiffs; and

    f.   John and Lawrence Koresko and CTC joined together and conspired to
actively conceal and hide the illegal transactions and loans from the Plaintiffs
in furtherance of their conspiracy.

102.   In light of this conspiracy, and Koresko's status as CTC's agent, the many acts of
fraudulent concealment of Koresko and Koresko *et al.* are attributable to CTC for purposes of
accrual of the statute of limitations.

103.     Sometime after the filing of the Koresko Bankruptcies, Plaintiffs investigated and, shortly before filing the complaint in this action, discovered the basis for the claims they alleged in the complaint. Moreover, shortly before the filing of this Second Amended Complaint, the plaintiffs herein learned the extent and details of their injuries.

104.     All of the claims alleged herein relate back to the filing of the initial complaint in this action in March 2015.  The initial complaint alleges the same conduct, occurrences, acts and transactions that form the basis for the RICO claims; including the same acts of misappropriation alleged here, and the joint participation of the Defendants in carrying them out.  As such, Defendants had full and fair notice of each of Plaintiffs' claims alleged in this Second Amended Complaint.

**Count I – ERISA, 29 U.S.C. §§ 1104, 1109 and 1132(a)(2)**

**The ERISA Plaintiffs on Their Own Behalf and On Behalf of The Sub-Class of All Benefit Plans Governed By ERISA, As Well As Said Plans' Participants and Beneficiaries vs. All Defendants**

105.     The ERISA Plaintiffs incorporate paragraphs 1-104, above, as if fully set forth herein.

106.     By the conduct described and, more particularly, by the conduct described in paragraphs 40-87, the defendants breached their fiduciary duties to the ERISA Plaintiffs in violation of 29 U.S.C. § 1104 (ERISA § 404), giving rise to liability for losses sustained by the ERISA benefit plans pursuant to 29 U.S.C. § 1109 (ERISA § 409).

107.     More specifically, under 29 USC §1109(a), "Any . . . fiduciary [of] . . . a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by

[ERISA] . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach. . .,"

108.    Under ERISA (29 USC §1104(a)(1)), the defendants owed plaintiffs fiduciary duties: (a) of undivided loyalty; and to act (b) solely in the interest of the plan participants and beneficiaries, (c) for the exclusive purpose of providing benefits to participants and beneficiaries, (d) with care, skill, prudence and diligence of a prudent person acting in like capacity in the conduct of a similar enterprise, and (e) in accordance with the documents and instruments governing the plan.

109.    Defendants breached their fiduciary duties, including but not limited to with the conduct alleged above, by, among other things, failing to (a) act in the sole best interest of the Plaintiff Class, (b) safeguard Trust assets, (c) monitor Koresko, Bonney, and the other fiduciaries of the Arrangement, and (d) comply with plan documents, including the Master Trust and Plan documents.

110.    The payments which CTC made to Koresko without obtaining explanations or clarification and for an improper purpose constituted violations of ERISA. *See Perez*, 86 F. Supp. 3d at 385. The "removal of over $35 million in loans from insurance policies used to secure the death benefits promised to participants," including the Plaintiff Class, were violations of ERISA.  *See Perez*, 86 F. Supp. 3d 293, 383-84.

111.    The Defendants' breaches of fiduciary duties caused Plaintiffs and the Class to suffer severe financial damages through conversion of assets from the Trusts through the prohibited transactions, including those enumerated in the *Perez* opinion and listed on Exhibit A, and through the illegal, unauthorized loans.

    **WHEREFORE**, Plaintiffs request that:

1. The defendants be ordered to:

   a. Make good all losses suffered by the plans as the result of the breaches.

      Losses include:

      i. All funds converted during the time defendants were plan
         fiduciaries;

      ii. All lost income that would have been earned on the converted
          funds; and

      iii. All interest paid or incurred on policy loans that were not for the
           benefit of the plans or their participants.

2. Plaintiffs be awarded attorney's fees and costs; and

3. The Court order such other equitable relief as it deems appropriate.


**Count II – ERISA, 29 U.S.C. §§ 1105, 1109 and 1132(a)(2)**

**The ERISA Plaintiffs on Their Own Behalf and On Behalf of The Sub-Class of All**

**Benefit Plans Governed By ERISA, As Well As Said Plans' Participants and**

**Beneficiaries vs. All Defendants**

112.    The ERISA Plaintiffs incorporate paragraphs 1-111, above, as if fully set
forth herein.

113.    By the conduct described and, more particularly, by the conduct described
in paragraphs 40-87, defendants:

   a. Participated knowingly in, and knowingly undertook to conceal, acts and
      omissions of their co-fiduciaries, including, but not limited to the breaches
      committed by their co-defendants, and by John Koresko, Jeanne Bonney,

Larry Townsend, PennMont Benefit Services, and the Koresko law firms, knowing such acts and omissions were a breach;

b.  Enabled these co-fiduciaries to commit breaches by failing to comply with 29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1))  in the administration of their specific responsibilities which gave rise to their status as a fiduciary; and

c.  Had knowledge of breaches by these co-fiduciaries and failed to make reasonable efforts under the circumstances to remedy the breaches.

114.  Consequently, the defendants are liable, pursuant to 29 U.S.C. §§ 1105 and 1109 (ERISA § 405 and 409), for the breaches of these co-fiduciaries.

**WHEREFORE**, Plaintiffs request that:

1.  The defendants be ordered to:

a.  Make good all losses suffered by the plans as the result of their co-fiduciaries' breaches.  Losses include:

i.  All funds converted during the time defendants were plan fiduciaries;

ii.  All lost income that would have been earned on the converted funds; and

iii.  All interest paid or incurred on policy loans that were not for the benefit of the plans or their participants.

2.  Plaintiffs be awarded attorney's fees and costs; and

3.  The Court order such other equitable relief as it deems appropriate.

**Count III – Common Law Breach of Fiduciary Duties**

**Non- ERISA Plaintiffs on Their Own Behalf and on Behalf of The Sub-Class of All**

**Benefit Plans Not Governed By ERISA, As Well As Said Plans' Participants and**

**Beneficiaries vs. All Defendants**

115.    The Non-ERISA Plaintiffs incorporate paragraphs 1-114, above, as if fully set forth herein.

116.    Defendants owed Plaintiffs the same fiduciary duties under the common law as they owed Plaintiffs under ERISA. *See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 570 (1985); *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828, 191 L. Ed. 2d 795 (2015).

117.    The defendants breached their fiduciary duties to the Non-ERISA Plaintiffs giving rise to liability for losses sustained by the Non-ERISA benefit plans.

**WHEREFORE**, Plaintiffs request that:

1.  The defendants be ordered to:

    a.  Make good all losses suffered by the plans as the result of the breaches. Losses include:

        i.  All funds converted during the time defendants were plan fiduciaries;

        ii.  All lost income that would have been earned on the converted funds; and

        iii.  All interest paid or incurred on policy loans that were not for the benefit of the plans or their participants.

2.  Plaintiffs be awarded attorney's fees and costs; and

3. The Court order such other equitable relief as it deems appropriate.

**Count IV - ERISA, 29 U.S.C. §§ 1106(b) and 1132(a)(3)**

**Plaintiffs on Behalf of The Class of Employee Benefit Plans Covered by ERISA vs.**

**The Commission Recipient Defendants**

118. Plaintiffs incorporate paragraphs 1-117, above, as if fully set forth herein.

119. The commissions paid to the Commission Recipient Defendants were paid for the personal benefit of Lawrence Koresko and other fiduciaries or for the benefit of entities owned and controlled by Lawrence and John Koresko.  As such, the commissions violated ERISA § 406(b)(3).

120. The Commission Recipient Defendants were either fiduciaries themselves or knowingly participated in and facilitated these violations of ERISA § 406(b)(3).

121. Plaintiffs, on behalf of the Trusts and on behalf of the ERISA employee benefit plans whose assets were held by the Trusts, have standing to assert a cause of action for disgorgement of the commissions.

**WHEREFORE**, plaintiffs request that judgment be entered in their favor and in favor of the classes they seek to represent on behalf of the Trusts and on behalf of the ERISA employee benefit plans whose assets were held by the Trusts and against the Commission Recipient Defendants.  Plaintiffs further request that:

1. The Commission Recipient Defendants be ordered to account for and disgorge to the Trusts:

   a. All commissions earned on the sale of insurance policies to the Trusts and paid to them or to entities they owned or controlled; and

      b.   Any profits derived from said commissions.

2.   Plaintiffs be awarded reasonable attorney's fees and costs; and

3.   The Court order such other equitable relief as it deems appropriate.

## COUNT IV– RICO (1962(c))

### All Plaintiffs v. CTC and Lawrence Koresko

122.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 121 above as though set forth at length herein.

123.    The Association-in-Fact described in paragraph 11 qualifies as an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4) and was, at all relevant times, engaged in interstate commerce or activities that affected interstate commerce. The purpose of these enterprises was to market, sell, operate and administer the Koresko Arrangement described in paragraphs 27-39 above.

124.    This Association-in Fact enterprise had a common and shared purpose among its members, continuity of structure, and an ascertainable structure distinct from that inherent in the pattern of racketeering perpetrated herein. Each entity and individual in the Association-in-Fact played various roles under the overall guidance and orchestration of John Koresko, as follows: (a). PennMont Benefit Services and Lawrence Koresko marketed the Arrangement, (b) the Trusts held the insurance policies the Arrangement purchased, (c) CTC acted as trustee of the Trusts, (d) Koresko Financial and other entities were the agents on the insurance policies, (e) the Regional Employers' Assurance Leagues acted as an umbrella association of employers so that the constituent plans could be considered a single Multiple Employer Welfare Association, (f) the Koresko law firms (i) provided the staff who performed the functions of PennMont Benefit

Services and (ii) handled dealings with regulatory entities such as the IRS and DOL, and (g) the individual employer plans established the terms under which employees could participate and designate beneficiaries of the insurance policies. The enterprise was formed in 1997 and continued in existence through mid-2013 when it was effectively placed in a run-out/liquidation mode as a result of injunctions issued in *Perez*.

125.     Though there were occasional changes in the members of the groups – changes in trustees, entities receiving commissions, the number and identity of the constituent plans – the basic structure remained unchanged for the 16 years of its existence.

126.     The Trusts also qualify as an enterprise within the meaning of RICO, 18 U.S.C. §1961(4).   They held themselves out as legal entities whose business was to handle and safeguard the assets of the employer benefit plans, including the Plaintiffs and others similarly-situated, which participated in the Koresko Arrangement.

127.     Defendants are persons within the meaning of 18 U.S.C. § 1962 who conducted the affairs of the enterprise through a pattern of racketeering activity including but not limited to numerous acts of conversion of assets of employee welfare benefit plans, mail fraud, and wire fraud, in violation of 18 U.S.C. §§ 664, 1341 and 1343.

128.     More specifically, defendant CTC conducted the affairs of the enterprise through at least 158 separate but related predicate acts of embezzlement of welfare benefit plan funds over a period of seven years as part of the scheme to defraud the participants in the Koresko Arrangement. *Perez*, Doc. 1134-1. These acts constituted violations of 18 U.S.C.  § 664 by CTC, and aiding and abetting the violations of 18 U.S.C. § 664 committed by Koresko, *et al.*  The duration of the scheme, at least 11 years (2002-2013), and the duration of CTC's participation in it, seven years, is more than sufficient to establish the continuity of the pattern.

129.     In addition, by emailing and mailing copies of the misleading Verifications of Trust and Warranties of Authority to over 40 insurance companies, CTC engaged in the predicate acts of mail fraud and wire fraud, all in furtherance of the scheme to convert plan assets.

130.     The numerous violations of 18 U.S.C. 664 committed by KAPC and Jeanne Bonney and the hundreds of deceptive mailings and emails sent by KAPC and Jeanne Bonney in furtherance of the scheme to defraud the plan sponsors, the plans themselves, the plan participants, and the plan beneficiaries are also attributable and imputed to CTC under principles of agency and *respondeat superior.*

131.     Defendant Lawrence Koresko, as one of the principal owners of PennMont Benefit Services and PPT, conducted the enterprise through over 80 separate but related predicate acts of embezzlement of welfare benefit plan funds over a period of eight years (2002-2010) as part of the scheme to defraud the participants in the Koresko Arrangement. *Perez*, Doc. 1134-1. These acts constituted violations of 18 U.S.C.  § 664 by Lawrence Koresko, and aiding and abetting the violations of 18 U.S.C. § 664 committed by CTC and other members of Koresko, *et al.*

132.     The numerous violations of 18 U.S.C. 664 committed by PennMont Benefit Services and PPT and the hundreds of deceptive mailings and emails sent by PennMont Benefit Services in furtherance of the scheme to defraud the plan sponsors, the plans themselves, the plan participants, and the plan beneficiaries are also attributable and imputed to Lawrence Koresko under principles of agency and *respondeat superior.*

133.    As a consequence, defendants CTC and Lawrence Koresko violated 18 U.S.C. § 1962(c).

134.    Plaintiffs and the class they represent have been injured in their property by reason of these violations in the sum of at least $40 million.  The Plaintiff plans, and their participants and beneficiaries, have a beneficial interest in the assets of the Trust.  *See Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230, 237 (3d Cir. 2016).

**WHEREFORE**, plaintiffs request judgment against defendants CTC and Lawrence Koresko, including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

## COUNT IV– RICO (1962(d)

### All Plaintiffs v. All Defendants

135.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 134 above as though set forth at length herein.

136.    By the actions described above and by numerous agreements and actions to further the scheme described therein, the defendants conspired to violate 18 U.S.C. 1962(c), in violation of 18 U.S.C. § 1962(d).

137.    As described in detail above, Defendants intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Association-in-Fact enterprise and the Trusts through the pattern of racketeering activity alleged above.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of § 1962(d).

138.    As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the class they represent have been injured in their property by reason of this violation in the sum of at least $40 million.

**WHEREFORE**, plaintiffs request judgment against defendants CTC and Lawrence Koresko, including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

Respectfully submitted,

s/ Ira B. Silverstein
The Silverstein Firm
By: Ira B. Silverstein
1515 Market Street, Ste. 1200
Philadelphia, PA 19102
Phone: (215) 854-4068
Direct: (267) 457-2273
Email: irasilverstein@tsfllc.net

David Lefkowitz
Wilshire Palisades Law Group, PC
By David Lefkowitz
1337 Ocean Avenue
Santa Monica, CA  90401
Phone: (310)393-4929
Email: dl@wplawgroup.com

*Attorneys for Plaintiffs*

Dated:          Philadelphia, Pennsylvania